# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AETNA INC., MARK T. BERTOLINI, AND SHAWN M. GUERTIN,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    PARTIES ............................................................................................................. 6

IV.     SUBSTANTIVE ALLEGATIONS ...................................................................... 7

        A.      Background ............................................................................................. 7

        B.      Defendants' Materially False and Misleading Statements.................... 8

        C.      The Truth Is Revealed ......................................................................... 14

V.      CLASS ACTION ALLEGATIONS .................................................................. 18

VI.     UNDISCLOSED ADVERSE FACTS .............................................................. 20

VII.    LOSS CAUSATION......................................................................................... 21

VIII.   SCIENTER ALLEGATIONS............................................................................ 22

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
        MARKET DOCTRINE ..................................................................................... 23

X.      NO SAFE HARBOR ........................................................................................ 24

XI.     COUNTS AGAINST DEFENDANTS .............................................................. 25

        COUNT I ........................................................................................................... 25

        COUNT II .......................................................................................................... 29

XII.    PRAYER FOR RELIEF .................................................................................... 30

XIII.   JURY TRIAL DEMANDED ............................................................................. 30

Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Funds ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Aetna Inc. ("Aetna" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Aetna's website concerning the Company's public statements; and (d) review of other publicly available information concerning Aetna and the Individual Defendants.

I.     **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Aetna securities between August 15, 2016 and January 20, 2017 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Aetna is one of the largest health care benefits companies in the United States, serving an estimated 46.3 million individuals nationwide.  Through its Health Care business segment, Aetna offers medical, pharmacy benefit management services, dental, behavioral health and vision plans on both an insured basis and an employer-funded basis.

3.     Aetna currently participates in certain public health insurance exchanges ("Public Exchanges") established pursuant to the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010 (as amended, collectively, "Health Care

1

Reform" or the "ACA").  Through the Public Exchanges, individuals can use their state's insurance marketplace to obtain coverage from competing private health care providers. In 2016, Aetna offered insurance plans in 778 counties across 15 states.

4.      On July 2, 2015, Aetna entered into a definitive agreement to acquire Humana Inc. ("Humana") in a transaction valued at approximately $37 billion (the "Humana Acquisition").  The proposed merger was approved by the companies' shareholders on October 19, 2015.

5.      On July 21, 2016, the U.S. Department of Justice (the "DOJ"), eight states, and the District of Columbia filed a civil complaint against Aetna and Humana in the U.S. District Court for the District of Columbia asserting that the proposed Humana Acquisition would violate antitrust laws and seeking a permanent injunction to prevent the acquisition from moving forward.

6.      One of the main issues raised by the DOJ was Aetna and Humana's commitment to the Affordable Care Act's Public Exchanges.  According to the DOJ, the proposed merger would lead to a loss of competition on the public exchanges in 17 counties in Georgia, Missouri, and Florida, counties in which Aetna and Humana both compete.

7.      On August 15, 2016, less than one month after the DOJ filed suit, Aetna's Chairman and Chief Executive Officer ("CEO"), Defendant Mark T. Bertolini ("Bertolini"), announced that Aetna would withdraw its participation in 11 of its 15 state Public Exchanges beginning in 2017, including the Company's participation in the 17 counties identified by the DOJ.  During the announcement, the Company presented evidence of how unprofitable the Public Exchanges around the country were, labeling Aetna's decision to withdraw from these exchanges as purely a business decision that was essential to address "sustainability concerns."

8.     This announcement paved the way for Aetna to argue in court that there was currently no competition between it and Humana in the 17 complaint counties.  As such, there can be no lessening of the competition after the merger is finalized.

9.     Nevertheless, throughout the Class Period, Defendants informed investors that their decision to withdraw Aetna from multiple Public Exchanges was purely a business decision aimed at reducing financial losses. For instance, during a conference call with analysts and investors on October 27, 2016, Defendant Bertolini emphasized that the Company had decided to reduce its participation in Public Exchanges as a way to effectively manage risk and "reduce the capital commitment behind this business" by reducing losses and "the variability in outcome of those losses."   According to Bertolini, "[w]e certainly did it to reduce fairly dramatically the amount of capital we had at risk and the amount of losses we would sustain."

10.     On January 23, 2017, Judge John D. Bates of the U.S. District Court for the District of Columbia entered a Memorandum Opinion enjoining the proposed merger between Aetna and Humana after finding, *inter alia*, that Aetna's senior executives "did not view withdrawing from the 17 compliant counties as a business decision," but rather as a way of improving Aetna's litigation position.  The court also noted that Aetna "tried to leverage its participation in the exchanges for favorable treatment from DOJ regarding the proposed merger" by threatening to reduce its Public Exchange participation in 2017 and beyond if the "DOJ sues to enjoin the transaction."

11.     The January 23, 2017 Memorandum Opinion detailed Aetna's decision-making process in the weeks leading up to the August 15, 2016 announcement regarding the Company's 2017 participation in the Public Exchanges, and concluded that Aetna's executives had attempted to "conceal from discovery in this litigation the reasoning behind their recommendation to

3

withdraw from the 17 compliant counties." Shockingly, the Company's executives "never assessed the profitability of Aetna's individual business in the 17 complaint counties." Had they undertaken this endeavor, Aetna executives would have noticed that Aetna chose to withdraw from some profitable states and stay in some unprofitable ones. For instance, Aetna's on-exchange business in Florida was the Company's third most profitable in 2015 and the first half of 2016, yet executives decided to leave Florida's Public Exchange.

12.     In reaction to the shocking disclosures in the court's Memorandum Opinion, Aetna's stock price dropped $3.33 per share, or 2.7%, from $122.53 per share on Friday, January 20, 2017 to $119.20 per share on Monday, January 23, 2017 — wiping out $1.17 billion of the Company's market capitalization. On Tuesday, January 24, 2017, Aetna stock price dropped an additional $1.59 per share, or 1.33%, as the market continued to digest the revelation of Defendants' misrepresentations. The January 24, 2017 stock drop wiped out an additional $558 million in Company market capitalization.

13.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company and its senior executives attempted to leverage Aetna's participation in the Public Exchanges for favorable treatment from regulators regarding the Humana Acquisition; (2) the Company threatened to limit its participation in the Public Exchanges if the DOJ attempted to block the merger; (3) Aetna did not withdraw from the Public Exchanges in the 17 compliant counties for business reasons as Defendants claimed, but to follow through on its threat of leaving the marketplace once the DOJ filed suit and to improve its litigation position; (4) Aetna withdrew from the Public Exchanges

4

that were profitable for the Company; and (5) as a result of the foregoing, Defendants' statements about Aetna's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

14.    As a direct result of Defendants' wrongful actions, Aetna's common stock traded at artificially inflated prices throughout the Class Period.

15.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District.

19.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.   **PARTIES**

20.     Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Funds, as set forth in the accompanying certification, incorporated by reference herein, purchased Aetna common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

21.     Defendant Aetna Inc. is a Pennsylvania corporation with its principal executive offices located at 151 Farmington Avenue, Hartford, CT 06156.  Aetna's securities are traded on the New York Stock Exchange ("NYSE") under the symbol "AET."

22.     Defendant Mark T. Bertolini ("Bertolini") was, at all relevant times, Chairman and CEO of Aetna.

23.     Defendant Shawn M. Guertin ("Guertin") was, at all relevant times, Executive Vice President and Chief Financial Officer of Aetna.

24.     Defendants Bertolini and Guertin are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Aetna's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive

6

representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## IV.   **SUBSTANTIVE ALLEGATIONS**

### A.   **Background**

25.    Founded in 1853 and headquartered in Hartford, Connecticut, Aetna sells traditional and consumer directed health care insurance plans and related services, including medical, pharmaceutical, dental, behavioral health, long-term care, and disability plans.  As of September 30, 2016, the Company had 23.1 million medical members, 14.3 million dental members, 15.3 million pharmacy benefit management services members, and 13.6 million group insurance members.

26.    On July 2, 2015, Aetna entered into a definitive agreement to acquire Humana for approximately $37 billion in a deal that would bring together Humana's Medicare Advantage business with Aetna's more diversified insurance portfolio.  According to a joint news release by the companies, "[t]he combined entity will help drive better value and higher-quality health care by reducing administrative costs, leveraging best-in-breed practices from the two companies — including Humana's chronic-care capabilities that measurably improve health outcomes for larger populations — and enabling the company to better compete with more cost effective products."

27.    On October 19, 2015, Aetna and Humana each obtained the approval of their respective shareholders necessary for the Humana Acquisition.  In June 2016, Aetna issued $13 billion of senior notes to partially fund the Humana Acquisition.

28.     Then, on July 21, 2016, the DOJ, eight states, and the District of Columbia filed a civil complaint in the U.S. District Court for the District of Columbia against Aetna and Humana charging that the Humana Acquisition would violate Section 7 of the Clayton Antitrust Act.  The DOJ complaint sought a permanent injunction to prevent Aetna from acquiring Humana.  According to the DOJ, the proposed merger would substantially lessen competition in two distinct product lines: individual Medicare Advantage plans and individual commercial health insurance plans offered on the Public Exchanges.  The government identified 17 counties across three states in which concentration in the Public Exchanges would rise above the presumptively unlawful level if the merger were to proceed.  The DOJ also accentuated that, since the companies compete head-to-head in the Public Exchanges, competition would be lost following the proposed merger.

**B.     Defendants' Materially False and Misleading Statements**

29.     On August 15, 2016, Aetna issued a press release entitled "Aetna to Narrow Individual Public Exchange Participation," in which the Company announced its intention to withdraw its participation in 11 of its 15 state ACA Public Exchanges.  The press release stated:

> HARTFORD, Conn.--(BUSINESS WIRE)--Aug. 15, 2016-- Aetna (NYSE: AET) Chairman and CEO Mark T. Bertolini made the following statement with regard to the company's 2017 participation in the Affordable Care Act individual public exchanges:
>
> "Following a thorough business review and in light of a second-quarter pretax loss of $200 million and total pretax losses of more than $430 million since January 2014 in our individual products, we have decided to reduce our individual public exchange presence in 2017, which will limit our financial exposure moving forward. More than 40 payers of various sizes have similarly chosen to stop selling plans in one or more rating areas in the individual public exchanges over the 2015 and 2016 plan years, collectively exiting hundreds of rating areas in more than 30 states. As a strong supporter of public exchanges as a means to meet the needs of the uninsured, we regret having to make this decision.

"Providing affordable, high-quality health care options to consumers is not possible without a balanced risk pool. Fifty-five percent of our individual on-exchange membership is new in 2016, and in the second quarter we saw individuals in need of high-cost care represent an even larger share of our on-exchange population. This population dynamic, coupled with the current inadequate risk adjustment mechanism, results in substantial upward pressure on premiums and creates significant sustainability concerns.

"The vast majority of payers have experienced continued financial stress within their individual public exchange business due to these forces, which also are reported to have contributed to the failure of 16 out of 23 co-ops. We are encouraged by a recent announcement that the U.S. Department of Health and Human Services will explore new options to modify the risk adjustment program, and remain hopeful that we can work with policymakers from both parties on a sustainable public exchange model that meets the needs of the uninsured.

"We are committed to a health care marketplace that gives every American the opportunity to access affordable, high-quality care. We will continue to evaluate our participation in individual public exchanges while gaining additional insight from the counties where we will maintain our presence, and may expand our footprint in the future should there be meaningful exchange-related policy improvements."

Aetna will reduce its individual public exchange participation from 778 to 242 counties for the 2017 plan year, maintaining an on-exchange presence in Delaware, Iowa, Nebraska and Virginia. The company will continue to offer an off-exchange individual product option for 2017 to consumers in the vast majority of counties where it offered individual public exchange products in 2016.

This decision does not impact Aetna's products, services or benefits for the 2016 plan year. The company will communicate options to impacted members before the 2017 open enrollment period begins, and provide resources to assist them in transitioning to other plans as appropriate.

30.     On October 27, 2016, Aetna issued a press release announcing its financial results for the third quarter ended September 30, 2016.  For the quarter, Aetna announced net income of $603.9 million, or $1.70 per share, and revenue of $15.78 billion.

31.     On that same date, the Company filed its Q3 2016 Form 10-Q with the SEC discussing Aetna's participation in the Public Exchanges in 2017, stating, in relevant part:

**2017 Outlook**
In August 2016, we announced that we will reduce our participation on the

individual public health insurance exchanges established pursuant to the ACA ("Public Exchanges") to 242 counties for the 2017 plan year from the 778 counties we serve in the 2016 plan year. We will maintain an on-Public Exchange presence for the 2017 plan year in Delaware, Iowa, Nebraska and Virginia. The counties we plan to serve in 2017 represented approximately 20% of our individual Public Exchange membership at September 30, 2016. The projected full year 2016 premium revenue for our individual Public Exchange products in the counties we will no longer serve in the 2017 plan year is approximately $2.7 billion. We have modified our off-Public Exchange product options for 2017 in the vast majority of counties where we offered individual Public Exchange products in 2016, which may adversely affect 2017 membership and premium in those counties.

In 2017, we project the following challenges will impact our standalone revenue:

> • The reduction in our individual Public Exchange footprint and modification of our off-Public Exchange products discussed above;

> • The projected impact of the suspension of the ACA's non tax-deductible health insurer fee (the "HIF");

> • The projected impact of known Medicaid contract losses; and

> • The projected impact of our continued strategy to improve margins in our ACA compliant small group products.

We also see the following opportunities in 2017:

> • The projected continued above industry growth in our individual Medicare Advantage products;

> • The projection that our reduced individual Public Exchange footprint will improve the financial performance of these products in 2017 as compared to 2016; and

> • The projection for improved financial performance in our ACA compliant small group products in 2017 as compared to 2016.

32.    With regards to the complaint filed against the Company by the DOJ, the Q3 2016

Form 10-Q stated, in relevant part:

On July 21, 2016, the U.S. Department of Justice (the "DOJ") and certain state attorneys general filed a civil complaint in the U.S. District Court for the District of Columbia against us and Humana charging that the Humana Acquisition would violate Section 7 of the Clayton Antitrust Act, and seeking a permanent injunction

10

to prevent Aetna from acquiring Humana (the "DOJ litigation"). The trial in the DOJ litigation is scheduled to begin during December 2016 and the trial court decision in the DOJ litigation is expected in January 2017. We plan to vigorously defend the Humana Acquisition.

As of October 26, 2016, we had obtained 90% of the state change of control regulatory approvals necessary to close the Humana Acquisition.

In order to address the DOJ's perceived competitive concerns regarding Medicare Advantage, on August 2, 2016, we entered into a definitive agreement (as it may be amended, the "Aetna APA") to sell for cash to Molina Healthcare, Inc. ("Molina") certain of our Medicare Advantage assets. Also on August 2, 2016, Humana entered into a substantially identical definitive agreement (as it may be amended, the "Humana APA") to sell for cash to Molina certain of Humana's Medicare Advantage assets. The sale price under the Aetna APA is approximately $76 million, based on the estimated membership in the plans that are involved in the transaction. We believe that taken together the divestitures contemplated by the Aetna APA and the Humana APA should address the DOJ's perceived competitive concerns regarding Medicare Advantage.

33.    In addition, the Q3 2016 Form 10-Q contained certifications signed by Defendants Bertolini and Guertin pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX"), along with certifications signed solely by Defendant Bertolini as CEO, pursuant to §906 of SOX, attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.

34.    For instance, Defendants Bertolini and Guertin certified in the Q3 2016 Form 10-Q that:

[T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

35.    With respect to Aetna's internal controls, Defendants Bertolini and Guertin certified in the Q3 2016 Form 10-Q that they were personally: (i) responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused Aetna's controls or procedures to be designed to ensure that material information relating to Aetna and its

consolidated subsidiaries was made known to them by others within those entities; (iii) designed

or caused Aetna's controls over financial reporting to provide reasonable assurance regarding the

reliability of financial reporting and the preparation of financial statements for external purposes

in accordance with GAAP; (iv) evaluated the effectiveness of the Aetna's disclosure controls and

procedures, and (v) presented in Aetna's quarterly and annual filings their conclusions about the

effectiveness of the disclosure controls and procedures.

36.     On October 27, 2016, Aetna held a conference call with analysts and investors to

discuss the Company's Q3 2016 results.   During the conference call, Defendant Bertolini

discussed Aetna's August 15, 2016 decision to reduce its participation in Public Exchanges,

emphasizing:

> Christine, what you have is a reduced number of, plus a pretty substantially
> reduced number of plan offerings in those geographies, as well as a much-reduced
> marketing presence in those geographies. So we expect that will serve to mitigate
> some of the pressure that we've had there this year. Conceptually in any given
> market, could there be more anti-selection to hit that book? Of course. I mean this
> book has proven difficult to predict over the last three years. ***The thing I would
> say is behind our decision-making here, this was really about risk management
> and we wanted to reduce the capital commitment behind this business, we
> wanted to reduce the losses and frankly we wanted to reduce the variability in
> outcome of those losses in terms of, sort of, establishing that footprint and what
> the plan offerings are.***
>
> So if you were to look at our off-exchange footprint, the reason we had to
> announce by August 15 was that the off-exchange markets we were withdrawing
> from, particularly the types of products, would presage our inability to maintain
> on-exchange presence. So that's sort of the way to look at it. Our off-exchange
> product offerings and markets sort of gave a heads up to everybody who is calling
> the insurance department every month that we were going to be pulling off of on-
> exchange markets by September 23.

37.     Also during the call, Kevin Mark Fischbeck from Bank of America Merrill Lynch

asked Defendants Guertin and Bertolini to comment on whether the deterioration in the Public

Exchanges is more skewed towards the business Aetna is staying in or the business Aetna is

leaving, prompting the following exchange:

**Shawn M. Guertin - Aetna, Inc.**

It is worse, and I would say that it's difficult to say whether off of one quarter I wouldn't want to make a directional comment out of this. I think we still feel – Mark described a framework before that we use to assess this from a business perspective and that framework was really more of an enterprise risk management framework than it was a market-by-market seriatim buildup. So I think looking at it today, I think we still feel good about trying to stay in the box that we established for next year. Having said that, we really need to go through the enrollment process and see how each of these markets on- and off-exchange play out.

**Mark T. Bertolini - Aetna, Inc.**

Remember we're still working off of weekly data, which is incomplete and has a lot of potential movement in it. So these are estimates still at this point in time.

**Kevin Mark Fischbeck - Bank of America Merrill Lynch**

And then you mentioned before that, obviously, you're not going to be able to get rid of all the exchange losses, but if we said that you were going to exit, I guess, call it 70% of your revenue, and let's just assume it meant 70% of the losses on the exchanges, are you talking about the fact that you're going to keep 30% of the losses or that even on that 70% of the losses, those don't all go away because it's fixed cost? If it's the latter, how do we think about the retaining of the fixed cost infrastructure?

**Mark T. Bertolini - Aetna, Inc.**

Until we see enrollment, we're not really going to get too far with assessing what the loss will be. We made estimates off of the current book of business, which by the way turned over almost 55% this last year. We had a certain frame of competitors in each market, which has already changed. More people have left the exchanges since we have. And so until we get a look at what the membership looks like, we're not really going to be able to nail the number with any degree of certainty. *We certainly did it to reduce fairly dramatically the amount of capital we had at risk and the amount of losses we would sustain. Negative returns on invested capital are not sustainable over the long term and so we tried to reduce both*.

38.    The statements referenced in ¶¶29-37 were materially false and/or misleading

because they misrepresented and failed to disclose material adverse facts pertaining to the

13

Company's business and operations, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company and its senior executives attempted to leverage Aetna's participation in the Public Exchanges for favorable treatment from regulators regarding the Humana Acquisition; (2) the Company threatened to limit its participation in the Public Exchanges if the DOJ attempted to block the merger; (3) Aetna did not withdraw from the Public Exchanges in the 17 compliant counties for business reasons, but to follow through on its threat of leaving the marketplace once the DOJ filed suit and to improve its litigation position; (4) Aetna withdrew from Public Exchanges that were profitable for the Company; and (5) as a result of the foregoing, Defendants' statements about Aetna's business, operations, and prospects were false and misleading and/or lacked a reasonable basis. As a result of this fraudulent scheme, Defendants were able to artificially inflate the Company's financials throughout the Class Period.

### C.   The Truth Is Revealed

39.    On January 23, 2017, Judge John D. Bates of the U.S. District Court for the District of Columbia entered a Memorandum Opinion enjoining the proposed merger between Aetna and Humana. Based on the evidence presented at trial, the court concluded that "Aetna withdrew from the 17 complaint counties for 2017 at least in part for the purpose of improving its litigation position." The court found significant evidence, primarily in the form of emails exchanged among senior Aetna executives, "that Aetna thought of the 17 complaint counties as one unit, and that it withdrew from those 17 counties to improve its position in this lawsuit." To that effect, the court asserted:

> The companies presented evidence of how unprofitable the public exchanges around the country were, and argued that Aetna withdrew as a business decision.

14

But while that evidence tends to show that Aetna had good business reasons for reducing its exchange footprint across the country, it does not show that Aetna withdrew from these specific counties for business reasons.

A review of the timeline is a helpful place to start. The key dates to keep in mind are July 21, 2016, when the complaint was filed, and August 15, 2016, when Aetna announced that it would not be offering on-exchange plans for 2017 in 11 of the 15 states where it had participated during 2016. Prior to filing the complaint, DOJ conducted an investigation. During that time, Aetna executives had multiple meetings with both DOJ and HHS, where Aetna connected this lawsuit with its future participation in the exchanges. Also prior to the complaint being filed, starting on July 9, 2016, a team of senior Aetna executives was considering Aetna's future participation in the exchanges across the country.  It is the internal documents and emails that this team produced that are ultimately the most illuminating.

40.     With respect to the connection between Aetna's Public Exchange participation

and the proposed merger with Humana, the court highlighted:

> ***During the investigation but before the complaint was filed, Aetna tried to leverage its participation in the exchanges for favorable treatment from DOJ regarding the proposed merger.*** On May 11, 2016, Bertolini was deposed in DOJ's investigation. At that deposition, Aetna's counsel stated that if Aetna was not "happy" with the results of an upcoming meeting regarding the merger, "we're just going to pull out of all the exchanges." Tr. 1353:6–10 (Bertolini). Bertolini affirmed his counsel, stating "Nice." Tr. 1353:15–18 (Bertolini). The next day, Bertolini, Steven Kelmar (Aetna's Executive VP and Bertolini's Chief of Staff) and HHS Secretary Sylvia Burwell (among others) had a meeting. There, Kelmar told Secretary Burwell that if the merger was blocked, Aetna "would likely have to revisit its plans for and presence on the public exchanges." Tr. 1354:2–6 (Bertolini); Tr. 1453:12–23 (Kelmar); PX0134 at 7 (Aetna's third response to interrogatories***). In a phone call on June 15, 2016, Bertolini told Secretary Burwell "if, by chance, you get a reach-out from the DOJ about us as a candidate for this merger, I would appreciate a good word for all that we've done with you."*** Tr. 1356:21–23 (Bertolini); see also PX0134 at 7. In preparation for that call, Kelmar sent Bertolini talking points that drew the connection between Aetna's participation in the exchanges and the merger more explicitly, stating: ***"By getting this deal done, I can make the commitment that we will expand our exchange footprint and continue to take a leadership position on expanding the value of exchanges to a greater part of the population," and, conversely, "[i]f we can't get to a good path forward on this deal the break-up fee of 1 billion dollars will significantly impact our business model and have some very tough consequences for us and the market."*** PX0113; Tr. 1454:18–1456:2 (Kelmar).

15

*Ultimately, Bertolini expressed this sentiment in a July 5, 2016, letter to DOJ (and forwarded to Secretary Burwell) where he stated: "if the DOJ sues to enjoin the transaction, we will immediately take action to reduce our 2017 exchange footprint"; "we would also withdraw from at least five additional states"; and if the merger is blocked, "we believe it is very likely that we would need to leave the public exchange business entirely."* PX0117 at 2; Tr. 1357:19–1358:24, Tr. 1359:20–1360:1 (Bertolini); PX0118. *Bertolini expressed a similar sentiment in a later email with Ron Williams, the former CEO of Aetna, after the complaint was filed, where he wrote that "the administration has a very short memory, absolutely no loyalty and a very thin skin."* PX0131; Tr. 1365:22–1366:1 (Bertolini). When asked during his deposition what he meant by that, Bertolini explained that "it was about my involvement in helping them get the Affordable Care Act structured and properly done. And so that was our feeling was that we were doing good things for the administration and the administration is suing us." Bertolini Oct. 11, 2016 Dep. 127:20–128:6, admitted at Tr. 1367:9–15 (Bertolini).

*This evidence shows that Aetna and its CEO, Bertolini, viewed participation on the exchanges as closely connected to DOJ's attempt to block the merger. Bertolini believed that DOJ should not block the merger in view of Aetna's role in advancing the ACA and participating in the exchanges, and Aetna was willing to offer to expand its participation in the exchanges if DOJ did not block the merger, or conversely, was willing to threaten to limit its participation in the exchanges if DOJ did. This is persuasive evidence that when Aetna later withdrew from the 17 counties, it did not do so for business reasons, but instead to follow through on the threat that it made earlier. But the most persuasive evidence is yet to come—internal Aetna documents and emails showing the factors that went into its decision-making process.*

41.    In its Memorandum Opinion, the court went on to highlight how Aetna's senior executives plotted their escape from the Public Exchanges after the DOJ complaint was filed:

Starting in early July, Bertolini convened a team of senior executives to evaluate Aetna's participation in the exchanges. Tr. 1360:17–22, 1362:5–1363:17 (Bertolini). This was prompted by information that Bertolini received on July 9 that Aetna had suffered large second quarter losses in its public exchange business. Tr. 1362:5–25 (Bertolini). The team included Karen Lynch, Aetna's President, Sean Guertin, Aetna's CFO, Jonathan Mayhew, the head of Aetna's exchange business, Fran Soistman, Aetna's Executive Vice President and head of government services, Kelmar, and Tom Sabatino, Aetna's General Counsel. Tr. 1363:1–17 (Bertolini); Tr. 1476:13–1477:6 (Lynch). This team ultimately put together a set of recommendations regarding how to reduce Aetna's exchange footprint that Bertolini approved without alteration in mid-August. Tr. 1449:21–1450:8 (Bertolini); Tr. 1473:23–1474:1 (Kelmar); Tr. 1497:19–24 (Lynch).

16

The day the complaint was filed, Aetna employees were instructed to gather information regarding the 17 complaint counties. PX0220-290. The team evaluating Aetna's exchange participation jumped into action as well. The following day, Soistman wrote in an email: ***"By the way, all bets are off on Florida and every other state given the DOJ rejected our transaction." PX0121-106. Later, he wrote to Kelmar: "I also need to share with you what I've learned about the 17 counties in the DOJ's complaint. We have a very narrow window of opportunity to affect changes in footprint particular with the off exchange business." PX0122-638. Soistman forwarded that email to Lynch saying: "I need to share with you what I learned during my meeting. Did not want to involve you officially as it may get ugly." PX0122-638. The following day, July 23, Kelmar asked Soistman: "Do the counties in the suit overlap with Humana's recent announcement of withdraw [sic]?" PX0124-626. When Soistman responded that "Humana remains in all 17 counties," Kelmar wrote: "Then that makes it easy we need to withdraw from those."*** PX0124-62641; Tr. 1460:10–1461:6 (Kelmar). At the same time, Kelmar told Lynch: "Most of this is a business decision except where DOJ has been explicit about the exchange markets. There we have no choice." PX0125; Tr.1462:4–13 (Kelmar). Lynch responded: "Agree." PX0125.

***The following day, the team took steps to update their recommendations to include the 17 complaint counties, without a business analysis of the exchanges in those locations. Mayhew sent Lynch a draft document entitled (in part) "Strategic Options for 2017 Footprint." PX0126 at 4; PX0127; Tr. 1481:9–1483:1 (Lynch); Tr. 1505:15–22 (Mayhew). Lynch responded, asking: "Does this include the 17 places in the DOJ complaint[?]"*** PX0127; Tr. 1483:2–11 (Lynch).

In response, Mayhew began what would become a series of emails where Aetna executives tried to conceal from discovery in this litigation the reasoning behind their recommendation to withdraw from the 17 complaint counties. Mayhew explained: "I was told to be careful about putting any of that in writing. I will have the attorney client privilege ccd by tomorrow." PX0127. Mayhew acknowledged at trial that he was told to include the reference to attorney-client privilege so as to prevent these documents from being produced in this litigation. Tr. 1508:3–7 (Mayhew). He agreed that the purpose of shielding these documents was to conceal how Aetna was handling the decisions about its exchange footprint. See Tr. 1509:7–11 (Mayhew). Lynch also relayed to Soistman the same concern. She told Soistman that bcc'ing her on an email "doesn't protect" the document because "it shows on the scan," which she explained referred to the scan "they do for discovery." PX0122-638; Tr. 1489:24–1491:24 (Lynch). Mayhew acknowledged Aetna executives instructed each other to call, rather than email, to avoid creating a written trail that could be revealed in discovery. Tr. 1509:7–11 (Mayhew); PX0122-638 ("Best we talk live."); PX0124 ("Can you take another quick call?").

42.     In reaction to the court's Memorandum Opinion, Aetna's stock price dropped $3.33 per share, or 2.7%, from $122.53 per share on Friday, January 20, 2017 to $119.20 per share on Monday, January 23, 2017 — wiping out $1.17 billion of the Company's market capitalization.  On Tuesday, January 24, 2017, Aetna stock price dropped an additional $1.59 per share, or 1.33%, as the market continued to digest Defendants' fraud.  The January 24, 2017 stock drop wiped out an additional $558 million in Company market capitalization.

## V.     CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Aetna securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Aetna and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Aetna's securities were actively traded on the NYSE, an open and efficient market, under the symbol "AET."  Millions of Aetna shares were traded publicly during the Class Period on the NYSE.  As of September 30, 2016, Aetna had 350.9 million shares of common stock outstanding.  Record owners and the other members of the Class may be identified from records maintained by Aetna

18

and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Aetna;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Aetna;

19

    e)        whether the market price of Aetna common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

    f)        the extent to which the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    UNDISCLOSED ADVERSE FACTS

49.     The market for Aetna's securities was an open, well-developed and efficient market at all relevant times.  As a result of these materially false and misleading statements and failures to disclose described herein, Aetna's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Aetna's securities relying upon the integrity of the market price of the Company's securities and market information relating to Aetna, and have been damaged thereby.

50.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Aetna's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and

20

misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Aetna's financial well-being and prospects.

52.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.   LOSS CAUSATION

53.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aetna's securities and operated as a fraud or deceit on Class Period purchasers of Aetna's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Aetna's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Aetna's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

54.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of Aetna's business practices and procedures.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Aetna to conceal the truth.

55.     Defendants' false and misleading statements had the intended effect and caused Aetna's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

56.     The decline in the price of Aetna's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Aetna's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Aetna's securities and the subsequent decline in the value of Aetna's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  SCIENTER ALLEGATIONS

57.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

22

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

58.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Aetna, their control over, receipt and/or modification of Aetna's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Aetna, participated in the fraudulent scheme alleged herein.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

59.     At all relevant times, the market for Aetna's securities was an efficient market for the following reasons, among others:

a)      Aetna securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)      As a regulated issuer, Aetna filed periodic public reports with the SEC and the NYSE;

c)      Aetna securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)      Aetna regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

60.     As a result of the foregoing, the market for Aetna's securities promptly digested current information regarding Aetna from all publicly available sources and reflected such information in Aetna's stock price. Under these circumstances, all purchasers of Aetna's securities during the Class Period suffered similar injury through their purchase of Aetna's securities at artificially inflated prices and a presumption of reliance applies.

61.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Aetna's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.     NO SAFE HARBOR

62.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Aetna who knew that the statement was false when made.

## XI.     COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

65.     During the Class Period, Aetna and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aetna securities; and (iii) cause Plaintiff and the other members of the Class to purchase Aetna securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

66.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Aetna securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.   The Individual Defendants are also sued herein as controlling persons of Aetna, as alleged herein.

67.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

68.     Aetna and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Aetna as specified herein.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Aetna's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material

facts necessary in order to make the statements made about Aetna and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Aetna's securities during the Class Period.

69.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Aetna's operating condition, business practices and future business prospects from the investing public and supporting the artificially

27

inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aetna securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Aetna shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Aetna securities during the Class Period at artificially inflated high prices and were damaged thereby.

72.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Aetna, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Aetna securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, Aetna and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     The Individual Defendants were and acted as controlling persons of Aetna within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

29

78.     As set forth above, Aetna and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 25, 2017                          Respectfully Submitted,

                                                 */s/ Jonathan P. Whitcomb*

                                                 **DISERIO MARTIN O'CONNOR
                                                 &CASTIGLIONI LLP**
                                                 Jonathan P. Whitcomb (Bar No. 403763)
                                                 jwhitcomb@dmoc.com

One Atlantic Street
Stamford, CT 06901
Tel:  (203) 569-1105
Fax:  (203) 348-2321

*Local Counsel for Plaintiff*

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com
                -and-
Maya Saxena
Joseph E. White, III
Lester R. Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

***Counsel for Plaintiff Westchester Putnam
Counties Heavy & Highway Laborers Local 60
Benefits Funds***

## CERTIFICATION AND AUTHORIZATION

I, Christine P. Costa, on behalf of the Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Fund Manager of Local 60 to initiate litigation on Local 60's behalf and to execute this Certification. I have reviewed the Complaint For Violations of the Federal Securities Laws in this matter and authorize its filing by counsel.

2.  Local 60 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Local 60 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Local 60's transactions in Aetna Inc. common stock are set forth below:

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/10/16 | 1,260 | $120.28 |
| Purchase | 12/09/16 | 1,540 | $127.22 |
| Purchase | 12/23/16 | 195 | $125.82 |

5.  Local 60 has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> *In re CenturyLink, Inc. Securities Litigation,* No. 3:14-cv-00658 (W.D. La.)
>
> *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds v. Brixmor Property Group Inc. et al.,* 1:16-cv-02400 (S.D.N.Y.)

6.  Local 60 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

7.  Local 60 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 60's pro rata share of any recovery, except such

reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 25th day of January 2017.

Westchester Putnam Counties Heavy &
Highway Laborers Local 60 Benefit Funds

Christine P. Costa, Fund Manager